

## NUMBER 13-13-00005-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

---

ANDREW MAES,         **Appellant,**

**v.**

ABRAHAM QUINTANILLA, III,
AND IRON TIGGA, LLC,         **Appellees**.

---

**On appeal from the 319th District Court
of Nueces County, Texas**.

---

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Longoria
Memorandum Opinion by Chief Justice Valdez**

This case involves a suit between members of a popular band known as the "Kumbia Kings." Alexandro ("Alex") and Rolando ("Rolando") Ramirez, and Andrew Maes ("Maes") brought suit against Abraham Quintanilla III ("Quintanilla"), and his wholly owned company, Iron Tigga LLC, for fraud, breach of contract, and breach of fiduciary duty,

among other claims. After a bench trial, the trial court entered judgment for Alex and Rolando—collectively, "cross appellees"—for fraud and breach of fiduciary duty, and assessed damages of $393,266.00 for each.[1] The trial court ordered that Maes take nothing. By two issues, which we reorganize as one, Maes, the appellant, argues that the trial court erred when it ordered that he take nothing. By four cross-issues, which we reorganize as two, Quintanilla, the cross-appellant, contends the following: (1) the evidence is legally and factually insufficient to establish that he (a) intended to defraud cross appellees, (b) stood in a fiduciary relationship with them, and (c) owes them the amount of royalties and concert revenues assessed by the trial court; and (2) the judgment erroneously assigns liability to Quintanilla in his individual capacity for what should have been the exclusive corporate obligation of Iron Tigga, LLC. We affirm.

## I.    Background[2]

In 1998 and 1999, Quintanilla formed a musical group with cross appellees and Maes, among others. During their first year, the band practiced and honed their style in Quintanilla's living room. According to Alex, during these early practice sessions, Quintanilla, who had already achieved success in a previous musical group, huddled the members, including cross appellees, together and told them that after he recouped his initial investment in the band, the rest of the earnings would be for them. According to Alex, Quintanilla also stated that he wanted to see the band members buy nice cars and a house. Cross appellees testified that they understood these statements as a promise

---

[1] Because the parties to this action have referred to Alex and Rolando as "cross appellees," we will also refer to them as such.

[2] Because this is a memorandum opinion and the parties are familiar with the facts, we will not recite them here except as necessary to advise the parties of the Court's decision and the basic reasons for it. *See* TEX. R. APP. P. 47.4.

2

by Quintanilla to share the band's profits. Cross appellees testified that based on Quintanilla's promise, they continued rehearsing and decided to forgo other opportunities. According to Alex, during these early practice sessions, the band played no shows and earned no income.

After a whole year of rehearsing, the band moved their act out of Quintanilla's living room, called themselves the Kumbia Kings, and began showcasing their music to the public. The band also released their first studio album, Amor, Familia Y Respeto. After playing a couple of free promotional shows, it was not long before the band began to achieve considerable recognition, popularity, and success. The testimony showed that concert audiences grew larger, and album sales increased. Eventually, the cross appellees were signing autographs and performing in front of 70,000 people at the Houston Livestock Show and Rodeo.

For cross appellees, however, the band's success did not translate into more money. The testimony showed that Quintanilla paid cross appellees no more than $175 per show, with a small bonus for larger shows, even though the band charged no less than $30,000 per show. When Alex brought the matter to Quintanilla's attention, Quintanilla told him to "just hang in there" and not to "worry about it [.]" Quintanilla also stated: "money [is] coming soon" and "everybody is going to be taken care of."

In November 2000, Quintanilla formed a company, Iron Tigga LLC, and contacted cross appellees and Maes to have each sign band member agreements. The evidence showed that, under the terms of these agreements, each member was entitled to receive a .05 percent royalty interest for the band's first three albums. Cross appellees testified that Quintanilla wrote each of them a check as an advance royalty payment. After the

3

contract signing, cross appellees noticed that Quintanilla bought a new car and a new house. Quintanilla's business partner, Crus Martinez, also bought a new house. Cross appellees still had not been paid. Reacting to these new purchases, Alex told himself: "[Quintanilla and Cruz] got theirs out of the way. Now it's going to be our turn, you know. They can't just keep doing that. You know, sooner or later they're going to say, you know, let's give these guys some. You know, they didn't do this by themselves." Alex testified that, instead of paying him and Rolando, Quintanilla "just kept going and buying cars and more houses."

By October 2002, approximately two years after signing the royalty agreement, Quintanilla still had not paid cross appellees or otherwise shared in the band's earnings. Before a photo shoot, cross appellees decided that it was time to confront Quintanilla about the situation. According to Alex, during this meeting, Quintanilla again made promises of payment and stated that he did not want cross appellees to leave the band. Cross appellees decided to give him one more chance, and as soon as they agreed to continue performing in the band, Quintanilla quickly hurried them over to do a photo shoot.

By February 2003, cross appellees had been performing in the band for approximately five years, but Quintanilla still had not paid them what cross appellees claim he promised or shared in the band's earnings. Soon after the release of the band's fourth album, cross appellees became frustrated with the situation and decided to quit the band. Rolando articulated the sentiment during this time: "[F]rustrated. [We weren't] getting paid what we should have been paid. . . [Y]ou're promised all these things, you're stuck in the same spot."

4

Quintanilla testified in his defense at trial. When asked to explain why cross appellees were never paid their share of the band's earnings, Quintanilla testified that he believed they had nothing to do with the band's success because they did not write the songs. He acknowledged that the band eventually enjoyed financial success, but stated that he did not pay cross appellees because they quit before the band became "wealthy." However, Quintanilla presented no evidence to substantiate his claim that the band's "wealth" came after cross appellees left in February 2003.

Wayne Coleman, cross appellees' expert, testified about the band's earnings during the time that cross appellees performed in the band. After adding up the band's album sales and concert income for the relevant timeframe, Coleman concluded that Alex, Rolando, and Maes were each entitled to $393,266 of the band's earnings.

After hearing all the evidence, the trial court entered judgment against Quintanilla and Iron Tigga LLC for fraud and breach of fiduciary duty, and assessed damages in accordance with Coleman's calculation. However, the trial ordered that Maes take nothing. This appeal followed, wherein Maes appeals the take-nothing judgment and Quintanilla and Iron Tigga LLC appeal the judgment entered in favor of cross appellees.

## II. Jurisdiction

As a threshold matter, we must determine whether we have jurisdiction to consider Quintanilla and Iron Tigga LLC's cross appeal. *See* TEX. R. APP. P. 42.3(a). An untimely notice of appeal fails to invoke our jurisdiction and requires dismissal of the appeal. *Wilkins v. Methodist Health Care Sys.*, 160 S.W.3d 559, 564 (Tex. 2005).

### 1. Pertinent Procedural History

5

On November 14, 2012, at the end of trial, the court orally pronounced its judgment. On November 21, 2012, before the trial court had the opportunity to reduce its judgment to writing, Quintanilla filed for bankruptcy—an action that automatically stayed further proceedings in the trial court. *See* 11 U.S.C.A. § 362 (2005) (automatic stay provision generally). Nevertheless, on November 26, 2012, the trial court signed its written judgment. On December 26, 2012, Maes filed his notice of appeal from the trial court's take-nothing judgment. On February 6, 2013, at the cross appellees' request, the federal court in which Quintanilla's bankruptcy petition had been filed entered an order annulling and retroactively lifting the automatic stay "for the purpose of validating and entering the [November 26, 2012] judgment." Specifically, the bankruptcy court's order provided the following:

> "[T]he automatic stay is annulled and retroactively lifted for the purpose of validating and entering the judgment in the case, *Ramirez, et al v. Iron Tigga, LLC, et al* (Case No. 07-169-G; in the 319th Judicial District Court of Nueces County, Texas). The Final Judgment is hereby recognized and validated and is considered entered as of November 27, 2012, the date on which it was signed by [the trial court]."

Following the bankruptcy court's order, on February 18, 2013, Quintanilla and Iron Tigga LLC filed a request for written findings of fact and conclusions of law in the trial court.[3] On May 7, 2013, Quintanilla and Iron Tigga LLC filed their notice of appeal.

**2. Applicable Law and Analysis**

---

[3] The trial court did not enter written findings in response to this request, but the record shows that Quintanilla did not file a proper request for past due findings. See Tex. R. Civ. P. 297 (requiring the party requesting past due findings to "file with the clerk and serve on all other parties in accordance with Rule 21a a "Notice of Past Due Findings of Fact and Conclusions of Law"). As cross appellees point out in their appellate brief, Quintanilla's request for past due findings did not comply with Rule 297. *See id.*

6

Cross appellees challenge the timeliness of Quintanilla and Iron Tigga LLC's notice of appeal in light of the bankruptcy stay. We will address cross appellees argument as to each party separately.

### a. Quintanilla

Concerning Quintanilla, cross appellees argue that his notice of appeal, filed on May 7, 2013, was untimely. Specifically, cross appellees contend that the bankruptcy court's order annulling the automatic stay on February 6, 2013 turned the once-existent stay into a nullity—"as though it never happened." Concerning the effect of this order, cross appellees reason that, if the stay never existed, the usual rule requiring Quintanilla to file a notice of appeal within thirty days of the trial court's judgment applies. *See* Tex. R. App. P. 26.1 (providing that the appealing party must file a notice of appeal within thirty days of entry of the judgment). Because Quintanilla failed to file a notice of appeal within thirty days of the judgment, cross appellees argue, his notice of appeal was untimely. We disagree.

The filing of a bankruptcy petition by a debtor operates to automatically stay the "continuation of any judicial action or proceeding against the debtor. . . ." *Black v. Shor*, 443 S.W.3d 170, 179 (Tex. App.—Corpus Christi 2013, no pet.) (citing the automatic stay provision contained in 11 U.S.C.A. § 362(a)). The automatic stay deprives state courts of jurisdiction over proceedings against the debtor. *Kalb v. Feuerstein*, 308 U.S. 433, 439 (1940). Any action taken against the debtor while the stay is in place is void and without legal effect. *Id.*; *Howell v. Thompson*, 839 S.W.2d 92 (Tex. 1992) (holding that an opinion issued after the filing of bankruptcy proceedings was void). The period to file the notice of appeal is also stayed by the imposition of an automatic stay. *In re Hoffinger Industries*,

7

*Inc.*, 329 F.3d 948, 953 (8th Cir. 2003) (concluding that "the filing of the notice of appeal in state court is one aspect of a continuation of a judicial 'proceeding against a debtor,' and [is] thus stayed") (citing 11 U.S.C.A. § 362(a)).

In appropriate cases, the bankruptcy court may grant relief from an automatic stay "by terminating, annulling, [or] modifying" it. *See* 11 U.S.C.A. § 362(d). Bankruptcy courts have the power to annul an automatic stay retroactively pursuant to section 362(d) in order to rehabilitate stay violations. *In re Hoffinger Industries, Inc.*, 329 F.3d at 953 (holding that annulment of stay was proper in order to rehabilitate notice of appeal that had been filed during pendency of the stay). We strictly construe an order from the bankruptcy court affecting an automatic stay. *Stephens v. Hemyari*, 216 S.W.3d 526, 529 (Tex. App.—Dallas 2007, pet. denied).

If a bankruptcy court grants relief from an automatic stay pursuant to section 362(d), parties affected by the stay are entitled to a thirty-day grace period in order to meet any applicable deadline fixed by state law—such as filing a notice of appeal—that had not expired before the stay was imposed. *See* 11 U.S.C.A. § 108(c)(2).[4] This thirty-day grace period applies when a stay is annulled by the bankruptcy court. *See In re Hoffinger Industries, Inc.*, 329 F.3d at 954 (implicitly recognizing that section 108(c) (2)'s thirty-day grace period applies to annulment orders).

In this case, the bankruptcy court's February 6, 2013 order stated the following:

> "[T]he automatic stay is annulled and retroactively lifted *for the purpose of validating and entering the judgment* . . . The Final Judgment is hereby

---

[4] Section 108(c) provides: "[I]f applicable [state law] . . . fixes a period for . . . continuing a civil action in a [state] court . . . on a claim against the debtor . . . and such period has not expired before the date of the filing of the [bankruptcy] petition, then such period does not expire until . . . 30 days after notice of the termination or expiration of the stay under section 362. . ., as the case may be, with respect to such claim." 11 U.S.C.A. § 108(c).

8

recognized and validated and is considered entered as of November 27, 2012, the date on which it was signed by [the trial court]."

(Emphasis added). Strictly construing the language of this order, *see Stephens*, 216 S.W.3d at 529, we note that by its very terms, the order annulled the stay "for the purpose of" retroactively validating the trial court's judgment—a judgment which, up until the date of the bankruptcy order, was void and without legal effect as having been entered in violation of the bankruptcy stay.[5]  *See Howell*, 839 S.W.2d at 92.  While the annulment order retroactively validated the void judgment, we cannot conclude, as cross appellees argue, that the order validated the existence of an appellate deadline that had previously been stayed by the bankruptcy filing.  Given the unique procedural circumstances of this case, we are not convinced that the language of the order can be construed as serving a purpose to effectively deprive Quintanilla of his right to appeal from the judgment for failing to file a notice of appeal at a time when doing so would have been in violation of the automatic stay.  We decline to read into the bankruptcy court's order a purpose that is not explicitly stated.  *See Stephens*, 216 S.W.3d at 529.

Having rejected cross appellees' interpretation of the bankruptcy court's order, we now turn to the question of whether Quintanilla's notice of appeal, filed on May 7, 2013, was timely.  After the bankruptcy court annulled the stay on February 6, 2013, Quintanilla was afforded a thirty-day grace period within which to file his notice of cross appeal under section 108(c)(2).  *See In re Hoffinger Industries, Inc.*, 329 F.3d at 954 (recognizing that bankruptcy debtor's notice of appeal was filed within thirty-day grace period provided under section 108(c)(2));  *see also id.* (observing that section 108(c)(2)'s thirty-day grace

---

[5] Quintanilla filed for bankruptcy on November 21, 2012, and the judgment was entered on November 26, 2012.  The bankruptcy court's order considers the judgment entered as of November 27, 2012.  While we recognize this discrepancy, it does not affect our analysis.

9

period would have allowed for filing of a notice of cross appeal within thirty days after the date of the annulment);  *Raley v. Lile*, 861 S.W.2d 102, 104 (Tex. App.—Waco 1993, writ denied).  Because Quintanilla filed a timely request for findings of fact and conclusions of law within thirty days of the bankruptcy court's order, his deadline to file a timely notice of appeal was extended from thirty days to ninety days under Texas Rule of Appellate Procedure 26.1(a)(4).  *See* TEX. R. APP. P. 26.1(a)(4) (extending a party's deadline to file notice of appeal from thirty to ninety days when a request is made for findings of fact and conclusions of law).  The record shows that Quintanilla filed his notice of appeal on May 7, 2013, which fell on the ninetieth day after the bankruptcy court entered its February 6, 2013 order.  Therefore, we conclude that Quintanilla's notice of appeal was timely.

### b.  Iron Tigga LLC

We now turn to cross appellees' argument that Iron Tigga LLC's notice of appeal— also filed on May 7, 2013—was untimely.  Cross appellees assert that Quintanilla's bankruptcy did not stay Iron Tigga LLC's deadline to file a notice of appeal because Quintanilla and Iron Tigga LLC are not equally entitled to stay protection.  We agree.

Absent "unusual circumstances," only the bankruptcy debtor is afforded stay protection.  *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986); *Marroquin v. D & N Funding, Inc.*, 943 S.W.2d 112, 115 (Tex. App.—Corpus Christi 1997, no writ).  As such, an automatic stay does not extend to "separate legal entities such as corporate affiliates, partners in debtor partnerships or to codefendants in pending litigation."  *Patton v. Bearden*, 8 F.3d 343, 349 (6th Cir. 1993) (internal quotations omitted).  A nondebtor, however, can demonstrate that "unusual circumstances" exist to obtain stay protection but must establish that:  (1) there is such an identity between the debtor and the nondebtor

10

that the debtor could be said to be the true defendant, and a judgment against the nondebtor would, in effect, be a judgment or finding against the debtor; or (2) extending the stay for the benefit of the nondebtor would contribute to the debtor's rehabilitation efforts. *Marroquin*, 943 S.W.2d at 115; *Brashear v. Victoria Gardens of McKinney*, L.L.C., 302 S.W.3d 542, 547 (Tex. App.—Dallas 2009, no pet.).

Here, no showing has been made that Quintanilla and Iron Tigga LLC are one and the same, or that a judgment against Iron Tigga LLC would be, in effect, a judgment against Quintanilla. In fact, Quintanilla and Iron Tigga LLC argue exactly the opposite in their appellate brief, wherein they assert that the judgment is, at best, only proper as to Iron Tigga LLC because Quintanilla is separate from that entity. Additionally, no argument has been made that extending stay protection to Iron Tigga LLC (the nondebtor) would have contributed to Quintanilla's rehabilitation efforts. Having found no evidence that Iron Tigga LLC was entitled to benefit from Quintanilla's stay protection, we conclude that, unlike Quintanilla, Iron Tigga LLC's deadline to file a timely notice of appeal was not stayed by Quintanilla's bankruptcy. *See Brashear*, 302 S.W.3d at 547 (employing the same analysis to determine whether section 108(c) applied to extend claimant's appellate deadlines as to her claims against nondebtor codefendants); *A.H. Robins Co.*, 788 F.2d at 999. We therefore lack jurisdiction to consider Iron Tigga LLC's appeal from the trial court's judgment. *See* TEX. R. APP. P. 26.1.

### 3. Conclusion

We conclude that section 108(c)(2) of the Bankruptcy Code applied to give Quintanilla thirty days from the date of the bankruptcy court's annulment order to file his notice of appeal. Quintanilla filed a request for findings of fact and conclusions of law

11

within that time frame, which extended his deadline to file a notice of appeal from thirty to ninety days. Quintanilla filed his notice of appeal on the ninetieth day—on May 7, 2013—and therefore the notice was timely. We further conclude that section 108(c)(2) did not extend Iron Tigga LLC's deadline to file a notice of appeal because no showing has been made that Iron Tigga LLC was entitled to obtain stay protection under Quintanilla's bankruptcy. We now address the merits of Quintanilla's challenge to the trial court's judgment entered against him and in favor of cross appellees.

### III. Quintanilla's Cross Issues

### 1. Evidentiary Sufficiency

By his first issue, Quintanilla contends the evidence was legally and factually insufficient to establish (1) that he intended to defraud cross appellees; (2) that he stood in a fiduciary relationship with cross appellees; and (3) that he actually owed cross appellees the amount of royalties and concert revenues assessed by the trial court.

### a. Standard of Review

In considering a legal sufficiency issue brought by the party who did not bear the burden of proof at trial, we view the evidence in the light most favorable to the verdict, giving credit to favorable evidence if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). If there is more than a scintilla of evidence proving the element of the claim, the evidence is sufficient. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 520 (Tex. 2002). Evidence does not exceed a scintilla if it is "so weak as to do no more than create a mere surmise or suspicion" that the fact exists. *Long v. Long*, 196 S.W.3d 460, 464 (Tex. App.—Dallas 2006, no pet.) (internal quotations omitted). In

reviewing a factual sufficiency issue, we consider and weigh all of the evidence and "set aside the verdict only if the evidence that supports the finding is so weak as to be clearly wrong and manifestly unjust." *Id.* (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)).

### b. Intent to Defraud

Quintanilla contends there was legally and factually insufficient evidence that he intended to defraud cross appellees when he promised to share the band's earnings, including royalties and concert revenue. When, as here, the intent to defraud involves a promise to do a future act, there must be evidence that Quintanilla made the promise with the "intention, design, and purpose of deceiving, and with no intention of performing the act." *SEECO, Inc. v. K.T. Rock, LLC*, 416 S.W.3d 664, 671 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (citing *Spoljaric v. Percival Tours*, Inc., 708 S.W.2d 432, 434 (Tex. 1986)). "Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." *Spoljaric*, 708 S.W.2d at 434. We measure intent not to perform at the time Quintanilla made the promise; however, intent may be established through subsequent acts after the promise was made. *Aquaplex, Inc. v. Rancho La Valencia, Inc.,* 297 S.W.3d 768, 774 (Tex. 2009) (per curiam). Because evidence of intent not to perform is usually not susceptible to direct proof, it can be proven by circumstantial evidence. *Id.* at 789.

Quintanilla's failure to perform a promise, standing alone, is not evidence of his intent not to perform when the promise was made. *Spoljaric*, 708 S.W.2d at 435. However, the failure to perform is a "circumstance to be considered with other facts to establish intent." *Id.* In addition, evidence that Quintanilla denied making a promise is another factor that bears on his lack of intent to perform when he made the promise.

13

*Stone v. Williams*, 358 S.W.2d 151, 155 (Tex. Civ. App.—Houston 1962, writ ref'd n.r.e.). We may also consider evidence that Quintanilla made no attempt to perform on the promise as evidence bearing on his lack of intent. *Chicago, T. & M.C. Ry. Co. v. Titterington*, 84 Tex. 218, 223–24 (1892) (observing that "subsequent utter failure and refusal to perform the promises or assurances," when coupled with other evidence, tends to show lack of intent to fulfill the promise at the time the speaker made the promise).

Here, there was evidence that Quintanilla promised to share the band's earnings with cross appellees and that he did not do so. There was also evidence that he did not fulfil his promise to pay royalties under the band member agreement. Although failure to perform under the contract is not sufficient, standing alone, to support a finding of fraud, *Spoljaric*, 708 S.W.2d at 435, "[Quintanilla's] breach of the contract, when coupled with only 'slight circumstantial evidence [of fraud],' will be sufficient to support a finding of fraudulent intent." *SEECO, Inc.*, 416 S.W.3d at 671 (quoting *Spoljaric*, 708 S.W.2d at 435). We conclude that, in this case, the circumstantial evidence supporting fraud was more than "slight," *see Spoljaric*, 708 S.W.2d at 435, as the evidence showed Quintanilla lied to cross appellees that the band played six free concerts when, in fact, "it was later discovered that . . . Quintanilla had charged and was paid approximately $30,000 for each of the concerts."

Moreover, as an explanation for his nonperformance, Quintanilla testified that cross appellees prematurely quit the band before the band became financially successful, thus implying that he would have kept his promise had they stayed longer. However, there was overwhelming evidence that the band enjoyed a high degree of popularity and financial success well before cross appellees departed in 2003; the evidence showed that

14

the band sold 3,700,000 albums and generated $2,880,000 in concert revenue between 2000 and 2002. Other testimony showed that, during this time, Quintanilla purchased a new house, a new car, and received $400,000 from the record label—all while cross appellees financially struggled to make ends meet. Thus, the trial court, as the trier of fact and judge of witness credibility, could have reasonably considered the contradictory nature of Quintanilla's testimony concerning the timing of the band's financial success as circumstantial evidence bearing on his lack of intent to perform the promise. *See id.* at 434 (recognizing that intent to defraud is a fact-intensive question that depends heavily on the credibility of the witnesses and the weight to be given to their testimony).

Furthermore, the evidence showed that Quintanilla demonstrated a consistent pattern of deception and nonperformance throughout cross appellees' tenure in the band. Alex testified that, every time he approached Quintanilla about the issue of nonpayment, Quintanilla reassured him to "just hang in there . . . money [is] coming soon." However, after the band generated millions of dollars in album and ticket sales, cross appellees finally had to quit out of "frustration" that Quintanilla never paid them what he promised.

Other portions of Quintanilla's testimony further revealed his lack of intent to perform. Quintanilla testified that, although cross appellees were a part of the band for approximately five years, he believed they had nothing to do with the band's eventual success.[6] The trial court could have reasonably inferred that Quintanilla would not have promised to share profits with members whom he believed did not contribute to the band's

---

[6] Quintanilla testified: "[cross appellees] tried hard, just like every other musician that's been in my band, but it's—the success are the songs, the hits." In addition to song popularly, Quintanilla attributed the band's success to its lead singer, stating: "I would have to say the success [of the band] is with the lead singer, D.J. Cane. That's who the people follow, the vocal." Notably, Quintanilla then admitted that D.J. Cane also sued him for "the same thing we're going through [in this case]."

15

success unless Quintanilla's intention from the beginning was to string them along with the promise of "big money" in order to continue profiting off of their performances for as long as possible. At the very least, Quintanilla's intent not to perform was supported by more than a scintilla of evidence. *See St. Joseph Hosp.*, 94 S.W.3d at 520.

On appeal, Quintanilla concedes that his company, Iron Tigga LLC, entered into a royalty agreement with cross appellees. However, he denies that he ever promised to share in concert revenues, noting there was no testimony that he orally promised to pay "any specific dollar figure . . . or any percentage of concert revenue." We disagree. Alex testified that, during the band's early practice sessions in 1998, Quintanilla told the members that he just wanted to break even on his investment and the rest would be for them. Quintanilla also told the members that he wanted to see them buy cars and a nice house. Later, when Alex approached Quintanilla about the issue of pay, Quintanilla stated: "money [is] coming soon" and "everybody is going to be taken care of." We also note that Quintanilla was asked on cross examination whether he promised to share in the "band's wealth," and Quintanilla responded: "And [the wealth] did come, but they didn't stick around for that." Rolando also testified that Quintanilla's promises included a share in the band's revenue. The testimony showed that cross appellees were paid between $150 and $175 per concert with a generally meager and insubstantial bonus for larger-audience shows. Thus, there was some evidence that Quintanilla's promise included a share of concert revenues. Finally, absent any evidence to the contrary, it was reasonable to infer that Quintanilla's promise implied a 1/11 share of concert revenue based on Coleman's testimony that the band included eleven members during the relevant timeframe. Under the appropriate standards, we cannot agree with Quintanilla

16

that the evidence was legally and factually insufficient to support a finding that his promise to share in the profits of the band excluded concert revenue. Thus, although Quintanilla did not deny that he promised to pay royalties, he denied making a promise to share concert revenues—a consideration which further supports a finding that he intended to defraud. *See Stone*, 358 S.W.2d at 155.

Moreover, there is some evidence that Quintanilla made an advance royalty payment to cross appellees in November 2000. However, there is no dispute that this one-time payment, ranging from three to seven thousand dollars, was unverified and constituted only a fraction of the total amount owed. Based on the amount of royalties owed under the contract, we cannot say Quintanilla made any real attempt to perform his obligations under the contract—another consideration which supports a finding of fraud. *See SEECO*, 416 S.W.3d at 671. We find that there is sufficient evidence, both legally and factually, to support the trial court's finding that Quintanilla intended to defraud cross appellees.[7]

### c. Advance Royalty

Quintanilla next complains that the evidence conclusively showed that cross appellees were awarded an extra $10,000 in royalties without any justification. Specifically, Quintanilla argues that, when Coleman calculated royalties owed, he failed to deduct $7,000 that Alex allegedly admitted to having received in November 2000 as an advance royalty and $3,000 that Rolando admitted to having received. Evidence is said to be legally insufficient when it conclusively establishes the opposite of a vital fact.

---

[7] Our disposition of this sub-issue obviates the need to address Quintanilla's argument related to the sufficiency of the evidence to support the existence of a fiduciary relationship with cross appellees. *See* TEX. R. APP. P. 47.1

*King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). We cannot conclude that cross appellees' testimony that they each received an advance royalty payment conclusively establishes Quintanilla's entitlement to a deduction—i.e., the opposite of a vital fact. Although Alex and Rolando testified that they recalled getting paid an advance royalty in November 2000, neither could remember the exact amount. The testimony was not conclusive. Furthermore, Coleman testified that, in calculating royalties owed, he did not deduct payment for alleged advance royalties because none of the parties provided any kind of verification as to the amount that was actually paid, or the payment's source. Thus, the trial court, in finding the royalty calculation supported by the evidence, could have reasonably relied on Coleman's testimony that deference to accounting principles dictated that a deduction was inappropriate for unsupported payments. We also conclude that the evidence supporting damages for unpaid royalties is not against the great weight and preponderance of the evidence. *Long*, 196 S.W.3d at 464.

### d. Concert Revenue

Quintanilla also contends that the damage award for unpaid concert revenue was "wholly speculative" and not supported by the evidence. In presenting this no-evidence point, Quintanilla challenges the reliability of Coleman's expert testimony concerning his calculation of unpaid concert revenue. Because Quintanilla failed to object to the admissibility of Coleman's expert testimony at trial, we must first determine whether Quintanilla preserved his no-evidence challenge. When a reliability challenge to expert testimony would require an appellate court to evaluate the "underlying methodology, technique, or foundational data" used by the expert, an objection must be timely made to the trial court in order to preserve a no-evidence challenge. *Coastal Transport Co., Inc.*

18

*v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004). However, no objection is required "when the challenge is restricted to the face of the record—for example, when expert testimony is speculative or conclusory on its face." *Id.* Thus, whether Quintanilla preserved his no-evidence challenge depends on whether he challenges Coleman's testimony as conclusory on its face or as unreliable.

In his brief, Quintanilla argues that Coleman's calculation concerning unpaid concert revenue was speculative and based on unreliable information. He provides the following support for this assertion: (1) Coleman relied on a potentially unreliable factual source, Paul Benavides, who, Quintanilla argues, had no actual knowledge of how many concerts cross appellees performed in the band, or how much the band charged per concert; and (2) Coleman never explained his basis for assuming that Quintanilla promised to pay cross appellees a 1/11 share of concert revenues, less a management fee.

In order to properly evaluate Quintanilla's complaint, we would be required to investigate the foundational data and methodology employed by Coleman to arrive at his conclusion. For example, we would be required to investigate Benavides' basis for knowing that the band played seventy-eight concerts between 2000 and 2002, with fees ranging from $30,000 to $60,000 per concert. We would also be required to determine whether the band included eleven band members during the time that cross appellees performed in the band and whether it is an accepted practice in the music industry to allot each band member an equal share of concert revenues in the absence of a specific agreement to the contrary. We find that this analysis would require us to explore the "methodology, technique, or foundational data" underlying Coleman's expert testimony.

19

*Id.* Because Quintanilla failed to object at trial, we decline to undertake the analysis for the first time on appeal. *Id.* Thus, we conclude that Quintanilla waived his complaint that Coleman's testimony provided "no evidence" of unpaid concert revenues. *Id.*

Although Quintanilla has failed to preserve his no-evidence point by failing to object at trial, to the extent that he confines his challenge to the face of the record, we find that Coleman's testimony was not speculative or conclusory. *See id.* (observing that "when the challenge is restricted to the face of the record—for example, when expert testimony is speculative or conclusory on its face—then a party may challenge the legal sufficiency of the evidence even in the absence of any objection to its admissibility"). Damages need only be proved with reasonable certainty—that is, damages must be "ascertainable in some manner other than by mere speculation or conjecture, and by reference to some fairly definite standard, established experience, or direct inference from known facts." *Berry Contracting, Inc. v. Coastal States Petrochemical Co.*, 635 S.W.2d 759, 761 (Tex. App—Corpus Christi 1982, writ ref'd n.r.e.).

Quintanilla argues on appeal that Coleman incorrectly calculated concert revenues by relying on unreliable information supplied by Benavides and also by assuming the existence of an agreement to share concert revenues without any proof that such an agreement existed. However, the evidence showed that Benavides did have personal knowledge about the band's concert activity. For example, Rolando testified that Benavides had "always been around most of the time," he toured with the band "a couple of times," he worked with Cruz, who was Quintanilla's close business partner in the band, and he had knowledge of matters concerning the band about which Rolando was not privy. Furthermore, Benavides, in his affidavit that was admitted into evidence, stated

20

that he had "personal knowledge" of the fact that the band charged $30,000 per concert in 2000 and played a total of fifteen paid concerts in that year; charged $30,000 per concert in 2001 and played a total of thirty concerts in that year; and charged $45,000 per concert in 2002 and played a total of thirty concerts in that year. Benavides also had personal knowledge that the band charged between $60,000 and $80,000 for each of three concerts at the Houston Rodeo Show. Coleman, relying on these figures, determined that concert revenue from 2000 to 2002 totaled $2,880,000.[8] Coleman also testified that, as a standard practice in the music industry, band managers were usually entitled to receive 15% of the gross concert income as part of their compensation. After accounting for this deduction, Coleman determined that the band brought in an adjusted gross income of $2,448,000 between 2000 and 2002. Coleman then divided this figure by eleven, based on the number of members in the band during the relevant timeframe. Based on these facts, Coleman concluded that cross appellees were each entitled to $222,545 in unpaid concert revenue. [9] In view of the forgoing, we cannot conclude that there is no basis for Coleman's calculation concerning concert revenues. *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009). The damage awarded for unpaid

---

[8] We also note that although Quintanilla denied the accuracy of these figures, he presented no witnesses or other evidence to controvert this evidence; instead, he testified that the documents he needed in order to rebut cross appellees' evidence concerning damages were "stolen" or had "disappeared." Recovery cannot be denied simply because the exact amount of damages cannot be ascertained. *Vance v. My Apt. Steak H. of San Antonio, Inc.,* 677 S.W.2d 480, 484 (Tex. 1984) (observing that "[i]f an injured party has produced the best evidence available, and if it is sufficient to afford a reasonable basis for determining his loss, he is not to be denied a recovery because the exact amount of the damage is incapable of ascertainment"); *O and B Farms, Inc. v. Black*, 300 S.W.3d 418, 422 (Tex. App.—Hous. [14th Dist.] 2009, pet. denied) (rejecting defendants' argument that the damage award was speculative, even though the amount of damages could not be calculated precisely because certain documents no longer existed).

[9] Quintanilla also challenges the inclusion of unpaid concert revenues in the damage assessment on the ground that no evidence supported a finding that Quintanilla promised to pay cross appellees a share of concert income. However, we have already concluded that Quintanilla's representations included the promise of shared concert revenues.

21

concert revenue was legally sufficient and not against the great weight and preponderance of the evidence. *Long*, 196 S.W.3d at 464; *City of Keller*, 168 S.W.3d at 807. We therefore overrule Quintanilla's first issue.

### 2. Personal Liability

By his second issue, Quintanilla contends he cannot be held personally liable for fraud in his individual capacity because he acted as an agent for Iron Tigga, LLC—a company wholly owned by him. However, it is well established that corporate agents can be liable in their individual capacity for fraudulent or tortious acts committed while serving their corporation. *Kingston v. Helm*, 82 S.W.3d 755, 758–59 (Tex. App.—Corpus Christi 2002, pet. denied); *Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002) ("[A] corporate agent is personally liable for his own fraudulent or tortious acts"). Because sufficient evidence supports a finding that Quintanilla defrauded cross appellees, he may be held liable in his individual capacity. Furthermore, the evidence showed that Quintanilla's fraud was independent and apart from any activity of Iron Tigga, LLC, as Alex testified that Quintanilla's false promises began during the band's early practice sessions, in 1998 and 1999, and there is no indication that Iron Tigga, LLC existed at that time. Finally, Alex testified that Quintanilla never qualified his false promises by stating that only Iron Tigga, LLC was obligated to fulfill Quintanilla's promises. Therefore, we overrule Quintanilla's second issue.

## IV. Maes' Issue

By two issues, which we recognize as one, Maes challenges the legal and factual sufficiency of the evidence to support the trial court's rejection of his fraud claim against Quintanilla.

## 1. Standard of Review

When, as here, the party with the burden of proof at trial brings a legal sufficiency issue complaining of an adverse finding, the party must show that the evidence conclusively establishes all vital facts in support of the finding sought by the party. *Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989). We first examine the record for evidence supporting the adverse finding and ignore all evidence to the contrary. *Dow Chem. Co.*, 46 S.W.3d at 241; *Sterner,* 767 S.W.2d at 690. If no evidence supports the finding, we then examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.* Evidence is conclusive "only if reasonable people could not differ in their conclusions, a matter that depends on the facts of each case." *City of Keller*, 168 S.W.3d at 816. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827.

When a party with the burden of proof complains that an adverse finding is factually insufficient, the party must demonstrate that the adverse finding is contrary to the great weight and preponderance of the evidence. *Dow Chemical*, 46 S.W.3d at 242. We weigh all the evidence, and can set aside a verdict "only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.* at 241.

## 2. Applicable Law and Analysis

To prevail on his fraud claim, Maes had the burden to prove that: (1) Quintanilla made a material misrepresentation; (2) Quintanilla knew the representation was false or made the representation recklessly without any knowledge of its truth; (3) Quintanilla

23

made the representation with the intent that Maes would act on that representation or intended to induce Maes' reliance on the representation; and (4) Maes actually and justifiably relied on the representation and suffered injury. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 217 (Tex. 2011).

Our analysis focuses on the fourth element—reliance. In rejecting Maes' fraud claim, the trial court implicitly found that Maes, the plaintiff, failed to carry his burden of demonstrating that he actually and justifiably relied on Quintanilla's promises.[10] We must first determine whether some evidence in the record supports the trial court's finding that Maes did not rely, while ignoring all evidence to the contrary. *Dow Chem. Co.*, 46 S.W.3d at 241. After carefully reviewing the record, we find no evidence that Maes did not rely on Quintanilla's promises. Thus, under the appropriate standard, we must examine the entire record to determine whether evidence of Maes' reliance was conclusively established as a matter of law. *Id.*

Maes argues that, because Quintanilla made the promises to all three plaintiffs, the trial court could not find the reliance element met as to Alex and Rolando without also finding the same element met as to him. We disagree. The fact that Quintanilla made promises to all three plaintiffs does not conclusively establish that each plaintiff acted in reliance thereon. In other words, while Alex and Rolando unequivocally testified that they continued performing for the band in reliance on Quintanilla's promises, the evidence was not conclusive that Maes continued performing for the same reason. It is quite possible that Maes continued performing for reasons that had nothing to do with the expectation that Quintanilla would keep his promise. For example, Maes may have been motivated

---

[10] The trial court did not enter findings of fact and conclusions of law.

24

to continue performing for a myriad of reasons, including celebrity status, popularity, increased exposure, or creative freedom. Furthermore, Maes did not appear for trial, and the trial court heard no direct testimony concerning his reliance. We therefore cannot conclude that the evidence conclusively establishes Maes' reliance. *See City of Keller*, 168 S.W.3d at 816 (observing that evidence is conclusive "only if reasonable people could not differ in their conclusions, a matter that depends on the facts of each case"); *see also id.* at 827 (recognizing that "[t]he final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review").

In reaching this conclusion, we are not blind to the fact that some circumstantial evidence supports a contrary proposition—i.e., that Maes did rely on Quintanilla's promises. *See Dow Chem. Co.*, 46 S.W.3d at 241 (directing that the reviewing court must examine the entire record to determine if the contrary proposition is established as a matter of law). For example, Alex testified that he believed Maes relied on Quintanilla's promises; however, Alex did not explain the basis of his belief, and the trial court, as the trier of fact, could have reasonably concluded that Alex was speculating. *See Horner v. Heather*, 397 S.W.3d 321, 325 (Tex. App.—Tyler 2013, reh'g overruled) (noting that "the trial court, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given their testimony"). Also, Quintanilla, during cross examination, acknowledged that Maes would have been entitled to trust him and rely on his statements; however, Quintanilla never testified that Maes did rely on any promise he made in connection with this case. The evidence also showed that Maes continued to perform for the band after Quintnailla's promises; however, as previously noted, this fact, standing

25

alone, does not conclusively establish that he continued to perform for the band with the expectation that Quintanilla would keep his promises.

Viewing the evidence in the light most favorable to the trial court's implicit findings, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not, we conclude that the evidence did not conclusively establish every element of Maes' fraud claim. *See Dow Chem. Co.*, 46 S.W.3d at 242. Furthermore, after considering and weighing all of the evidence, we cannot conclude that the trial court's findings are against the great weight and preponderance of the evidence. *See id.* Thus, the evidence was legally and factually sufficient to support the trial court's adverse finding as to Maes. We overrule his sole issue.

## V. Conclusion

We affirm the judgment of the trial court.

**/s/ Rogelio Valdez**
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
30th day of April, 2015.

26