**Reversed and Rendered in Part, Reversed and Remanded in Part, and Opinion filed September 26, 2013.**



In The

# Fourteenth Court of Appeals

## NO. 14-12-00357-CV

## SEECO, INC. AND SOUTHWESTERN ENERGY COMPANY, Appellants

## V.

## K.T. ROCK, LLC, Appellee

**On Appeal from the 127th District Court
Harris County, Texas
Trial Court Cause No. 2009-69705**

# O P I N I O N

SEECO, Inc. entered into a three-year purchase agreement (the "Contract") with K.T. Rock, LLC for the purpose of buying crushed rock primarily for its gas well development operations in central Arkansas. SEECO bought substantially less rock from K.T. than anticipated during the first two years of the Contract.

Shortly into the third year of the Contract, K.T. sued SEECO and Southwestern Energy Company, SEECO's parent company, for breach of contract

and fraudulent inducement. SEECO counterclaimed for breach of contract. After a trial, the jury found that SEECO complied with the Contract and that K.T. failed to comply with it. However, the jury awarded SEECO no damages for K.T.'s failure to comply. Further, the jury found, by clear and convincing evidence, that SEECO fraudulently induced K.T. to enter into the Contract. The jury found that $2.5 million would compensate K.T. for its damages for SEECO's fraud and that $500,000 should be assessed against SEECO and awarded to K.T. in exemplary damages. After a hearing, the trial court entered judgment (1) awarding K.T. actual damages from SEECO and Southwestern Energy, jointly and severally,[1] of $2.5 million and exemplary damages of $500,000, (2) that SEECO take nothing on its breach-of-contract claim, and (3) denying K.T.'s and SEECO's motions for recovery of attorney's fees.

On appeal, SEECO challenges the legal and factual sufficiency of the evidence to support the jury's fraudulent inducement finding and the jury's damages and punitive damages awards upon which the trial court's judgment is based. Because we agree that there is legally insufficient evidence to support K.T.'s fraudulent inducement claim, we reverse and render a take nothing judgment on that claim. SEECO further contends that the trial court erred in denying its motion for attorney's fees because it was the prevailing party under its Contract with K.T. Rock. SEECO was entitled to recover attorney's fees under the Contract because it was the prevailing party on K.T.'s breach-of-contract dispute. We reverse the trial court's judgment as to the attorney's fees issue and remand that issue only for further proceedings consistent with this opinion.

---

[1] The jury found Southwestern Energy Company responsible for the conduct of SEECO, a finding not challenged on appeal.

BACKGROUND

SEECO is in the oil and gas exploration business in the Fayetteville Shale area of central Arkansas. As part of its operations, SEECO buys large quantities of rock to create well pads, roads, and related facilities. This dispute centers around SEECO's DeSoto Project, a gas exploration and drilling project located in the Fayetteville Shale area. K.T., owned by Keith Waddell, Paul Hudson, and Ben Moorhead, was formed in 2007 after Waddell began discussions with SEECO's DeSoto Field Manager in Arkansas, George Sheffer. Based on its drilling plans, SEECO estimated it would need approximately one million tons of rock from fall 2007 through mid 2008. Waddell suggested to Sheffer that K.T. could provide 600,000 tons of rock a year to SEECO.

After some initial negotiation with K.T., SEECO put out a request for bids; K.T. was the successful bidder. K.T. purchased rock-crushing equipment sufficient to operate crushing activities out of two quarries simultaneously. K.T. also hired numerous personnel so that it could begin its rock-crushing operations out of a quarry in the far-east area of the Fayetteville Shale area. SEECO and K.T. entered into the Contract in August 2007. The Contract provided that SEECO would buy at least 500,000 tons of material per year, although SEECO "at its option" could "defer purchase of any of its yearly requirement of 500,000 tons of [rock] so long as [SEECO] purchase[d] the deferred tonnage before the end" of the three-year term of the Contract. K.T. was required to make at least 2,000 tons of three-inch rock and at least 5,000 tons of SB2 rock available each day (the "daily tonnage") at a quarry specified by SEECO.[2] SEECO could adjust the daily tonnage amounts at any time during the term of the Contract. K.T. agreed that SEECO could have access to and "load out capability" for the rock twenty-four

_____

[2] As part of its bid request, SEECO specified four general quarry locations.

hours a day, seven days a week. The Contract also provided that K.T. "occasionally" would be required to move its equipment from quarry to quarry at the request of SEECO. SEECO would specify from which quarry it would purchase rock by giving K.T. at least seven days' notice before the date of purchase; K.T. was to move its equipment to the specified quarry and have its daily tonnage available for SEECO's purchase within twenty-four hours after the end of the notice period.

The Contract also provided the following "early buyout" provision:

> At its sole discretion, [SEECO] may at any time elect to terminate this Agreement during the Initial Term [the first three years of the Contract] by giving [K.T.] written notice of such termination as of the date provided in such notice. . . . In such event, [SEECO] shall pay [K.T.] the fee ("Early Buyout Fee") as calculated in Exhibit "B" attached hereto.[3]

If K.T. failed to make available to SEECO the daily tonnage at the specified quarry, SEECO was entitled, after notifying K.T., to suspend performance. Any rock that SEECO purchased from a third-party supplier while performance was suspended was to be deducted from SEECO's purchase obligations under the Contract. This remedy was in addition to SEECO's right to terminate the Contract in the event of K.T.'s failure to perform its obligations (other than those excused by Force Majeure) under the Contract.

The Contract could not be amended unless in writing and executed by each party. All notices under the Contract were required to be in writing. Finally, the Contract contained the following attorney's fee clause:

> If any action at law or in equity, including an action for declaratory relief and collection of an account, is brought to enforce or interpret

---

[3] The formula for the early-buyout fee was $4 million, minus a portion of K.T.'s revenue. It is undisputed that SEECO never exercised its option to terminate and pay this fee.

4

the provisions of this Agreement, the prevailing Party shall be entitled to recover reasonable attorney's fees from the other Party, which fees may be set by the court in the trial of such action or may be enforced in a separate action brought for that purpose, and which fees shall be in addition to any other relief which may be awarded.

The Contract was executed and effective on August 15, 2007.

During the first year of the Contract, from August 15, 2007 to August 14, 2008, SEECO purchased 249,914 tons of rock from K.T. SEECO purchased over 1.5 million tons of rock from other quarries during that year. From August 15, 2008 to August 14, 2009, SEECO purchased 300,585 tons of rock from K.T. and almost one million tons of rock from others. Thus, by the third year of the Contract, August 15, 2009 to August 14, 2010, SEECO needed to (1) purchase 1,019,681 tons of rock to fulfill its obligation or (2) exercise the buyout option before the end of the Contract's term.

Sheffer and Larry Hadley, SEECO's Energy Construction Superintendent, both explained that the largest reason for the shortfall in purchasing rock from K.T. during the first years of the Contract was K.T.'s quarry locations: contractors who built the well pads for SEECO used the closest quarry to the well sites, and K.T.'s quarry locations were not the closest. Hadley requested in writing in May 2008 that K.T. move its quarry location closer to SEECO's drilling operations, but K.T. did not move locations until November 2008. Hadley believed that this delay in moving caused SEECO to "lose out" on approximately 100,000 to 150,000 tons of rock purchases by SEECO. Further, once SEECO became aware of the deficit in purchases, Hadley began instructing his construction supervisors and foreman that they needed to purchase as much rock as possible from K.T., although Hadley acknowledged that these construction personnel often did not comply with his instructions. According to Hadley, he added an additional fifteen miles to

SEECO's normal ten-mile range for quarry locations only for K.T. quarries in an attempt to overcome the shortage in SEECO's rock purchases from K.T. However, no one at SEECO monitored how much rock was being taken from K.T.

In September 2008, K.T. contacted SEECO to request that another year be added to the existing Contract with an additional 250,000 ton purchase requirement. SEECO considered this option, but Walt Mitchell, Senior Manager of Strategic Sourcing at Southwestern, suggested adding an additional year to the Contract, but without any additional tonnage requirements. Mitchell further noted that the Contract allowed for a reduction of SEECO's commitment for the times K.T. was unable to provide rock, which Hadley had reported to him had occurred "numerous times." However, Mitchell acknowledged that documentation of these shortages was an issue.

In October 2008, Keith Clay, Southwestern's Director of Supply Chain Management, emailed Sheffer, explaining that SEECO was "upside down" on the Contract in a "bad way." Clay noted that an attached analysis provided "the details and several options." He explained that "two things ha[d] submarined this deal": SEECO's move to multi-well pads and SEECO's "discipline with th[e] contract (enforcement, documentation, etc)." Clay further stated in this email, "We need to begin thinking of an alternative option that does not involve adding additional tonnage and gets us out of this contract as it is written (at least the buy-out piece of the contract)."

Attached to this email was a spreadsheet entitled "K.T. Rock Commitment Analysis," dated October 3, 2008. This analysis showed that, based on SEECO's anticipated demand, it would not be able to fulfill its rock commitment with K.T.[4]

---

[4] This spreadsheet actually states, "SWN will not be able to fulfill the rock commitment with K.T. Rock, Llc. [sic]."

Three "options" were outlined in this spreadsheet: (1) "Remain As-Is," which would result in an anticipated buyout of $1,961,876.80; (2) "Extend Contract w/ Additional Tonnage," which provided for a one-year contract extension and a 250,000 ton additional rock commitment and required SEECO to use K.T. on approximately 87% of its "locations" until August 2011; and (3) "Extend Contract w/ No Additional Tonnage," which provided for a one-year extension of the Contract and no additional rock commitment and required SEECO to use K.T. on approximately 73% of its "locations" until August 2011. Mitchell stated in an email to Clay that

> it is not very feasible to assume that we will be able to take 73% (option 3 on the attached spreadsheet) of our rock from [K.T.] without going south on hauling distances from their 4 or so quarry sites to our locations, thus impacting delivered rock cost. We must point out that multi-well pads substantially changed the landscape of this deal. Did they really have $4mm in start up for this? If not, the buyout should be negotiated down as well.

After meetings between Clay and K.T.'s Hudson in Houston in July 2009, SEECO asked K.T. if K.T. could deliver 3,000 tons of rock per day—1,500 tons per day from each of two quarries from which K.T. was operating.[5] Although the Contract did not require K.T. to operate out of more than one quarry at a time, K.T. agreed with this plan; it had already been operating out of more than one quarry at that point in time. This agreement to produce and deliver 3,000 tons of rock per day over the remainder of the term of the Contract would satisfy the obligations of both parties: rock purchases by SEECO would total 1.5 million tons or more, and K.T. would receive all the money it expected under the Contract. Further,

---

[5] The parties had previously agreed that K.T. would provide SEECO only SB2 rock and had reduced the daily tonnage amount, consistent with the Contract, to 5,000 tons per day of SB2 rock only. However, the overall commitment by SEECO to purchase 1.5 million tons of rock during the three-year term of the Contract was not changed.

producing 3,000 tons of rock per day was less than K.T.'s obligation under the Contract.

In early August 2009, SEECO began taking substantially larger quantities of rock from K.T. than it had in the past. During three days in early August, SEECO took over 17,000 tons of rock from K.T.'s two quarries. However, K.T. was unable to consistently produce 1,500 tons of rock per day at each quarry. K.T began having equipment problems and one of its quarries was unable to operate due to a computer failure in the rock-crushing equipment. On August 19, 2009, SEECO suspended K.T. for failure to perform under the Contract. SEECO lifted the suspension on September 14, but K.T. again had difficulty producing the 1,500 tons of rock per day at each of its quarries.[6] SEECO again suspended performance under the Contract on October 22, 2009.

K.T. filed suit against SEECO and Southwestern on October 28, 2009,[7] alleging breach of contract, fraud in the inducement, and joint business enterprise/alter ego. SEECO and Southwestern filed a general denial; SEECO counterclaimed for breach of contract. After a nine-day trial, a jury found that SEECO did not breach the Contract, but that K.T. did. However, the jury did not

---

[6] On October 8, SEECO notified K.T. that, under the Contract, K.T. was required to operate additional quarries. In this letter, SEECO stated,

> Pursuant to the advance notice given in our letter of September 14, 2009, SEECO hereby requests that K.T. Rock establish a third quarry . . . , which shall be addition to the two quarries located at Cleveland and Morganton. SEECO requests that K.T. Rock establish this third quarry by November 1, 2009, or SEECO will be forced to mitigate damages incurred as a result of K.T. Rock's breach by purchasing rock from third party suppliers in that area and deducing such amounts (with the applicable cost factor) from its purchase obligations under the Agreement.

[7] According to Hadley, SEECO continued to build wells in the north-central portion and actually increased its well-building activity in the far-east portion of the Fayetteville Shale area after K.T. stopped operations in October of 2009.

award SEECO any damages for K.T.'s breach. The jury also found, by clear and convincing evidence, that SEECO fraudulently represented that it intended to perform the Contract and awarded K.T. both actual damages of $2.5 million and exemplary damages of $500,000.

SEECO and Southwestern moved to disregard certain jury findings and for entry of judgment; K.T. filed a motion for judgment notwithstanding certain jury findings or alternatively, judgment on the verdict. Both SEECO and K.T. also filed motions for attorney's fees as the prevailing party under the Contract. After a hearing, the trial court signed its final judgment on February 28, 2012, awarding K.T. actual damages of $2.5 million and exemplary damages of $500,000. The trial court entered a take-nothing judgment on SEECO's breach-of-contract claim and disregarded the jury's finding that K.T. failed to comply with the Contract as "immaterial." Finally, the court denied both SEECO's and K.T.'s motions for attorney's fees. SEECO and Southwestern's motion for new trial was denied, and this appeal timely followed.

## FRAUD

In SEECO's first issue, it asserts that the trial court erred in denying its motion to disregard certain jury findings and enter judgment as modified.[8] Specifically, SEECO asserted the evidence is legally insufficient evidence to support the jury's fraudulent inducement finding because, as is relevant here, there is no evidence that it did not intend to perform the Contract when it executed the Contract and its partial performance for more than two years negated K.T.'s allegation of fraud as a matter of law.

---

[8] SEECO and Southwestern also moved for a directed verdict during trial.

9

## A.      Standard of Review and Governing Law

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable persons could, and disregarding contrary evidence unless reasonable persons could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). We may not sustain a legal sufficiency, or "no evidence" point unless the record demonstrates: (1) a complete absence of a vital fact; (2) the court is barred by the rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810.

The elements of fraud are (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *Aquaplex, Inc. v. Rancho la Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam).

"Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998). However, a promise to act in the future constitutes fraud only when such promise was made with the intention, design, and purpose of deceiving, and with no intention of performing the act. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986). We measure a party's intent not to perform the promise to act in the future at the point the party makes such promise; however, prior intent not to perform at the time of the promise may be proven through

10

evidence of the party's subsequent acts after the representation is made. *Aquaplex, Inc.*, 297 S.W.3d at 775. Moreover, because intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence. *Id.*

Where, as here, the promise to perform in the future is a promise to perform under a contract between the parties, failure to perform or breach of contract is circumstantial evidence courts consider. Stated differently, a party's failure to perform under the contract is not sufficient, standing alone, to support a fraud finding; but failure to perform is a circumstance to be considered with other facts to establish intent. *Spoljaric*, 708 S.W.2d at 435. Thus, a party's breach of the contract, when coupled with only "slight circumstantial evidence," will be sufficient to support a finding of fraudulent intent. *Id.*

## B. Application

K.T. relies upon the following as evidence that SEECO never intended to purchase the total amount of rock outlined in the contract:

- SEECO's Southeast Rainbow Project, which SEECO began planning in Spring 2007, before the Contract was signed, and SEECO's decision to begin building multi-well pads shortly after entering into the Contract with K.T., evidencing SEECO's plan to decrease its need for rock.

- SEECO's failure, during the first two years of the Contract, to purchase an amount of rock anywhere close to the 500,000 tons per year specified in the Contract, followed by SEECO's push during the latter part of the second year and early part of the third year to make up for its own shortfall in purchasing by demanding unreasonable amounts of rock from K.T.;

- SEECO's existing relationships with other contractors, including K.T.'s competitors, involved in the DeSoto project, which SEECO knew would make it difficult, if not impossible, for SEECO to fulfill its purchase commitments to K.T.;

11

- SEECO's failure to establish policies to ensure that it purchased rock from K.T. and SEECO's failure to monitor the amount of rock it purchased from K.T.; and

- SEECO's determination, prior to entering into the Contract with K.T., that it would only purchase rock from K.T. if K.T.'s quarries were located within a certain distance of SEECO's drilling sites, despite any provision in the Contract conditioning SEECO's purchase commitments on the location of K.T.'s quarries.[9]

According to K.T., these actions demonstrate that SEECO never had any intention of performing its obligations under the agreement. We disagree. It is undisputed that SEECO *did not promise* (a) to purchase 500,000 tons of rock per year for three years; (b) to purchase rock solely from K.T.; or (c) to purchase rock from other vendors in any given year only after it purchased 500,000 tons of rock from K.T. Instead, SEECO promised to purchase 500,000 tons of rock from K.T. each year for three years *or* to defer such quantity to a date not to exceed the term of the contract *or* to pay K.T. a buyout fee. Even if we assume that SEECO never intended to purchase 500,000 tons of rock per year or 1.5 million tons of rock in three years, we could not conclude that this is sufficient evidence that SEECO did not intended to fulfill its promise to perform under the contract because the contract provided for alternative methods of performance. To sustain the jury verdict of fraud, we must find evidence that SEECO did not intend to keep its promise to take or pay.

K.T. cites to no circumstantial evidence that SEECO did not intend to pay the buyout fee if it did not purchase 1.5 million tons of rock. K.T. does point to evidence that SEECO and Southwestern personnel wanted to avoid the buyout fee. Emails from Mitchell and Clay indicate that SEECO was aware that it was behind

---

[9] However, as discussed above, the Contract provided that K.T.'s quarry operations would be mobile and that SEECO had the authority to request that K.T. quickly move its operations within a specified time period to a SEECO-specified quarry.

in its purchase of rock from K.T., and that SEECO and Southwestern were exploring options to fulfill or renegotiate the Contract. None of these emails indicate that, at the time SEECO entered into the Contract, it had no intention of performing it. Rather, these emails indicate that in October 2008, over a year into the Contract, Southwestern personnel were looking at their options under the Contract and attempting to determine a solution for their shortfall, including considering the buyout option or possible contract extensions.

We do not view this as evidence that, at the time SEECO entered into the Contract, it did not intend to perform. *See Formosa Plastics*, 960 S.W.2d at 47–48 ("[T]he evidence presented must be relevant to Formosa's intent at the time the representation was made."). In fact, Keith Clay testified at trial that SEECO's plan if it had been unable to take the 1.5 million tons under the Contract during the three-year term was to exercise the buyout clause, but that it preferred to take the rock; Clay explained that SEECO did not exercise the buyout option because it was sued by K.T. prior to the end of the Contract term.

Moreover, to the extent that such evidence gives rise to an inference that SEECO never intended to exercise a buyout option, it also gives rise to an inference that SEECO, finding itself behind on annual purchases, needed to rely upon the deferral option under the contract and catch up or it would have to pay the buyout fee. The jury may not indulge this inference of fraudulent intent where the same "meager circumstantial evidence" gives rise to other equally probable inferences. *See Hancock v. Variyam*, 400 S.W. 59, 70–71 (Tex. 2013). And although SEECO's and Southwestern's subsequent actions in taking as much rock as possible and strictly enforcing the terms of the Contract could indicate a desire on their part to force K.T. into breach, these actions likewise could indicate a desire on their part to mitigate the buyout fee that SEECO and Southwestern would

13

have to pay in the event that SEECO was unable to meet its obligations under the Contract. Again, these equal inferences preclude us from crediting the circumstantial evidence to fraudulent intent. *See id.*

Finally, K.T. has not challenged the jury's finding on appeal that SEECO complied with the Contract. The evidence supports the jury's finding that SEECO complied with the Contract. It is simply undisputed that SEECO did not breach the Contract. Instead of "slight circumstantial evidence" of intent to defraud coupled with the breach of the promise to perform,[10] here we have undisputed evidence of SEECO's performance under the Contract. SEECO, by purchasing rock from K.T.—albeit less rock than K.T. anticipated—was in the midst of performing its promises under the Contract when K.T. stopped producing rock and filed suit against it.

In sum, after viewing all the evidence in the light most favorable to the jury's fraud finding, indulging every reasonable inference in favor of K.T., we conclude that there is no evidence that SEECO, at the time it entered into the Contract, did not intend to perform. Accordingly, we conclude that the evidence is legally insufficient to support the jury's finding that SEECO committed fraud against K.T. and the trial court erred by entering judgment in favor of K.T. on its fraud claim. We sustain SEECO's first issue and render judgment that K.T. take nothing on its fraud claim. Our disposition of this issue obviates the need to address the remainder of SEECO's issues related to K.T.'s fraud claim.

## ATTORNEY'S FEES

In its sixth issue, SEECO contends the trial court erred when it denied its motion for attorney's fees because it was the "prevailing party" in K.T.'s breach-

---

[10] *See Spoljaric*, 708 S.W.2d at 435.

of-contract claim against it. Texas law prohibits recovery of attorney's fees unless authorized by statute or contract. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310–11 (Tex. 2006). As noted above, the Contract between SEECO and K.T. contained a "prevailing party" provision, providing in pertinent part that "[i]f any action at law or in equity . . . is brought to enforce or interpret the provisions of this Agreement, the prevailing [p]arty *shall* be entitled to recover reasonable attorney's fees from the other [p]arty" (emphasis added).

Our primary concern when interpreting a contract is to ascertain and give effect to the intent of the parties as expressed in the contract. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006); *Bhatia v. Woodlands N. Houston Heart Ctr.*, 396 S.W.3d 658, 669 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). Contract terms are given their plain, ordinary, and generally accepted meanings, and contracts are to be construed as a whole in an effort to harmonize and give effect to all provisions of the contract. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 662 (Tex. 2005); *Bhatia*, 396 S.W.3d at 669–70. The Contract does not define "prevailing party," so we presume the parties intended the phrase's ordinary meaning applies. *Bhatia*, 396 S.W.3d at 270 (citing *Intercont'l Group P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009); *Fitzgerald v. Schroeder Ventures II, Inc.*, 345 S.W.3d 624, 629–30 (Tex. App.—San Antonio 2011, no pet.)).

We have previously interpreted "prevailing party" in such contract provisions to mean the party that prevails on the main issue in the litigation. *See id.* (collecting cases). For a defendant, prevailing would mean successfully defending the main action. *Id.* (collecting cases). "Typically, this would mean obtaining a take-nothing judgment on the main issue or issues in the case." *Id.* (collecting cases).

15

Here, although SEECO did not prevail at trial, on appeal we have determined that the trial court erred in entering judgment on K.T.'s fraud claim. Further, the jury found that SEECO complied with the Contract, a finding unchallenged on appeal and supported by the evidence. The jury further found that K.T.'s failure to comply with the Contract was not excused, another finding not challenged on appeal. Thus SEECO successfully defended against K.T.'s breach-of-contract claim. Under these circumstances, SEECO is the "prevailing party" and is thus entitled to reasonable attorney's fees under the terms of the Contract.[11]

However, the reasonableness of SEECO's fees is a question for the finder of fact. *See Smith v. Patrick*, 296 S.W.3d 545, 547 (Tex. 2009). Here, the fact finder regarding attorney's fees was the trial court. Accordingly, we sustain SEECO's sixth issue and reverse the trial court's judgment as to attorney's fees and remand that part of the case to the trial court for a new trial.

## CONCLUSION

We have sustained SEECO's first issue concerning the legal sufficiency of the evidence supporting K.T.'s fraud claim, and render a take-nothing judgment on K.T.'s fraud claim. Further, we have sustained SEECO's sixth issue regarding its entitlement to attorney's fees as the prevailing party under the Contract. We

---

[11] Neither party submitted jury questions regarding attorney's fees in this case. Instead, both parties moved for attorney's fees after the jury returned its verdict. The Contract, as noted above, provided for fees to the prevailing party "as set by the court in the trial of such action" or "enforced in a separate action brought for that purpose." Because there was no jury question regarding fees, SEECO did not waive its right to fees under the Contract. *Cf. Intercont'l Group P'ship*, 295 S.W.3d at 657–59 (concluding that Intercontinental failed to preserve issue of whether it was entitled to attorney's fees under contract for successful defense of breach-of-contract claim because it failed to present evidence and jury question regarding contractual attorney's fees, while opposing party did).

reverse that portion of the trial court's judgment denying SEECO's attorney's fees and remand only that issue to the trial court for a new trial.


/s/ Sharon McCally
Justice

Panel consists of Justices Christopher, Jamison, and McCally.

17