# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 2, 2020

Lyle W. Cayce
Clerk

No. 19-50361
CONSOLIDATED WITH
No. 19-50858

9503 MIDDLEX, INCORPORATED; 9514 MIDDLEX, INCORPORATED; 2103 DANBURY, INCORPORATED; 2100 MANNIX, INCORPORATED,

*Plaintiffs—Appellees Cross-Appellants*,

*versus*

CONTINENTAL MOTORS, INCORPORATED,

*Defendant—Appellant Cross-Appellee*.

Appeals from the United States District Court
for the Western District of Texas
USDC No. 5:17-CV-622

Before DENNIS, SOUTHWICK, and HO, *Circuit Judges*.

PER CURIAM:*

---

* Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

The four plaintiffs are corporations that leased four commercial buildings to the defendant company. Months after the leases ended, the plaintiffs sued the defendant for breach of the lease agreements, claiming several separate violations. The district court resolved several of the claims on summary judgment, leaving the remaining claims for resolution through a bench trial. The district court resolved the rest of the claims in favor of the plaintiffs following the trial. We AFFIRM in part, REVERSE in part, and VACATE and REMAND the order concerning attorneys' fees.

## FACTUAL AND PROCEDURAL BACKGROUND

The defendant, Continental Motors, Inc., manufactures aircraft engines. In July 2015, Continental purchased an airplane-part manufacturing business from Danbury Aerospace. Also that month, Continental entered five agreements to lease six buildings from four of Danbury's subsidiaries. Continental entered separate agreements to lease Building A from 9503 Middlex, Inc. ("Lease A"), Building B from 9514 Middlex, Inc. ("Lease B"), Building C from 2103 Danbury, Inc. ("Lease C"), Building D from 2100 Mannix, Inc. ("Lease D"), and Buildings E and F from 2100 Mannix, Inc. ("Lease E/F"). These four corporations are the plaintiffs in this case. The buildings are located near the San Antonio International Airport.

Each lease had a twenty-four-month term. Leases B, C, and E/F contained early termination provisions giving Continental the right to terminate the lease early with six months' notice to the landlord. On September 1, 2015, Continental gave its six-months' notice to terminate Lease B, effective March 1, 2016. Then, on January 1, 2016, Continental gave six-months' notice that it was terminating Lease C and Lease E/F, effective June 30, 2016.

Before turning the properties over to the plaintiffs, Continental asked its maintenance personnel to make sure everything was "up to par." A

representative of the plaintiffs also inspected each property before it was turned over. Anything that needed fixing would be reported to Continental to complete. For example, the plaintiffs asked Continental to remove the ammonia tank left on the Building B premises after the building had been vacated, and Continental removed the tank on the same day.

When Continental purchased the business from Danbury, Continental continued to employ many of the same people. After the lease ended and Continental turned the E and F premises over to the plaintiffs, some Continental employees continued using the outdoor picnic area on breaks. A Continental employee would unlock the gate on the premises to allow other employees to use a shortcut to Buildings A and D. The gate had two locks, creating two access points; Continental informed the plaintiffs of the combination to one lock but did not give them the key to the other padlock. That allowed both parties access through the gate. Continental did not otherwise use Buildings E and F or their premises and delivered the buildings' keys to the plaintiffs. Continental did not attempt to exclude the plaintiffs from the property, and the plaintiffs brought people onto the premises to look at the buildings.

From June 30 to September 27, 2016, the plaintiffs did not raise an objection about possession of Buildings E and F, despite observing Continental's use of the property. On September 27, the plaintiffs sent a letter to Continental, demanding holdover rent in the amount of $78,088.50 under Section 12(b) of Lease E/F. Section 12(b) applies "[i]n the event of holding over in possession of all or part of" the leased premises.

On April 19, 2017, the plaintiffs sent a second demand letter to Continental, this time claiming $2,800 for repair costs due to "exposed electrical connections" in Building B and $10,000 to fix a broken air-conditioning unit in Building C. Section 16 of Leases B and C provides that the tenant must keep the property "in as good a repair and operating

condition as" the start date of the lease.  Section 19(a) of Lease B also had a notice-and-cure provision requiring the plaintiffs to give Continental notice and the opportunity to repair "[a]ny damage caused by the installation or removal of . . . equipment, trade fixtures, or air conditioning and/or heating equipment owned by" Continental.

On July 12, 2017, the plaintiffs sued Continental in Texas state court. Continental removed the case to the United States District Court for the Western District of Texas.  On December 6, the plaintiffs filed their first amended complaint, alleging Continental breached the lease agreements and claiming $31,027.75 in property taxes, $42,615.74 for insurance premiums, $78,088.50 in holdover rent, and $12,800 for maintenance and repairs.  The plaintiffs also sought late charges and attorneys' fees.

On April 5, 2018, the plaintiffs moved for summary judgment on all claims.  The motion was referred to a magistrate judge, who recommended granting summary judgment for some of the plaintiffs' claims.  The district court granted the plaintiffs' summary-judgment motion for unpaid property taxes, insurance premiums, and late charges, but denied the motion as to the claim for holdover rent, maintenance and repair costs, and attorneys' fees. Section 27 of the five lease agreements provides that "[i]f either party shall file suit against the other in connection with this Lease or any matter pertaining to the Premises, the losing party in court shall pay any court costs, reasonable costs of litigation, and [a] reasonable amount of attorney fees incurred by the prevailing party in court."

The district court conducted a bench trial on the remaining claims. On March 26, 2019, the district court issued findings of fact and conclusions of law.  The district court awarded the plaintiffs $90,888.50 and held that the plaintiffs were entitled to attorneys' fees, ordering further briefing on that issue.  The district court separately entered final judgment the same day, awarding the plaintiffs $181,516.45, cumulative of the summary-judgment

award and the post-bench trial award. Continental timely filed its original notice of appeal on April 25.

On April 5, 2019, the plaintiffs filed in the district court an Application for Attorney's Fees, Costs of Court, and Litigation Expenses, and Motion to Amend Judgment to Award Late Fees and Interest. The plaintiffs requested $153,719.62 in attorneys' fees, a conditional award of $54,750.00 in attorneys' fees if Continental appealed to this court, along with conditional attorneys' fees awards in the event that Continental petitioned the United States Supreme Court for *certiorari*.

On August 23, 2019, the district court awarded the plaintiffs $151,719.17 in attorneys' fees, $3,876.32 in litigation expenses, and $7,843.89 in taxable costs. The court declined to order conditional appellate attorneys' fees. In the same order, the district court awarded the plaintiffs $4,544.43 in late fees relating to holdover. On September 13, 2019, Continental filed an amended notice of appeal. Then, on September 24, the plaintiffs timely filed a conditional notice of cross-appeal. FED. R. APP. P. 4(a)(3).

## DISCUSSION

"In the appeal of a bench trial, we review findings of fact for clear error and conclusions of law and mixed questions of law and fact *de novo*." *Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 294 (5th Cir. 2009); FED. R. CIV. P. 52(a)(6). On clear-error review, we examine whether factual findings lacked "substantial evidence to support [them], the court misinterpreted the effect of the evidence, or this court is convinced that the findings are against the preponderance of credible testimony." *Petrohawk Props., L.P. v. Chesapeake La., L.P.*, 689 F.3d 380, 388 (5th Cir. 2012) (citation omitted). Contract interpretation is a legal issue that we review *de novo*. *See Lloyd's Syndicate 457 v. FloaTEC, L.L.C.*, 921 F.3d 508, 513 (5th

Cir. 2019). In this diversity case, Texas substantive law applies. *Coe v. Chesapeake Expl., L.L.C.*, 695 F.3d 311, 316 (5th Cir. 2012).

The issues briefed on appeal were all decided by the district court after the bench trial. We first consider whether Continental was a holdover tenant. Then we address the air-conditioning repair costs, followed by the electrical-wiring repair costs. We close with the issue of attorneys' fees.

## I.     *Breach of Lease E/F: Holdover tenancy*

Continental argues the district court improperly defined "holdover in possession" and thus erred in holding that Continental had breached the lease by its minor uses of the property. The district court held that Continental breached Section 12(b) of Lease E/F when Continental maintained the keys to the gate and continued to unlock the gate to allow employees to take a shortcut on a regular basis and when Continental's employees used the picnic tables on the premises of Buildings E and F. Continental argues that these acts do not constitute "holding over in possession" of the premises because Continental vacated the building, the plaintiffs had access to and exclusive control of the buildings, and Continental never excluded the plaintiffs from the property.

Two subsections of Section 12 of Lease E/F are key:

> (b)     Other Holding Over. In the event of holding over in possession of all or part of the Premises by Tenant without the written consent of Landlord, after the expiration or other termination of this Lease and without execution of a new Lease, Tenant shall, throughout the entire holdover period, be liable for and pay monthly Base Rental equal to the Applicable Holdover Multiplier times the monthly Base Rental . . . plus all additional rent which would have been applicable had the Term of this Lease continued through the period of such holding over by Tenant . . . . Any holding over without Landlord's prior written consent shall constitute Tenant a tenant-at-sufferance of Landlord, subject to immediate eviction. . . .

No. 19-50361

(c)    Failure to Remove Property and Subtenants Constitutes Holding Over.  For purposes hereof, "holding over" by Tenant includes failure by Tenant to remove a material quantity of equipment or other personal property from the Premises that Landlord has not (in this Lease or hereafter) given Tenant approval in writing to abandon to Landlord in the Premises . . . ; provided, however, that Tenant will not be deemed holding over by reason of unauthorized equipment or personal property left in the Premises until Landlord has given Tenant written notice . . . of such equipment or property remaining in the Premises and Tenant has had five (5) business days after the giving of such notice to remove said equipment and personal property.

The district court applied Texas law to determine the common meaning of "holdover," concluding that it means an "occupation" of property, which is a "low bar."  Under the district court's interpretation, mere use constitutes occupation.

"In construing a contract, a court must ascertain the true intentions of the parties as expressed in the writing itself." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011).  Texas courts begin with the plain language used in the contract.  *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017).  We must "examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be meaningless." *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999).

The lease does not define "holding over in possession." Section 12(c) of the lease does state that holdover "includes" failing to remove personal property.  That section provides that a tenant who fails to remove property from the premises will not be deemed holding over until the landlord gives the tenant notice and five days to remove the personal property.  The plain language of Section 12(c) does not mandate notice for all holdovers, just those

where the tenant left personal property behind, so Section 12(c)'s notice provision does not apply here. If in the right circumstances merely leaving some personal property behind can constitute holding over, then the lease seemingly defines holding over as something less than the tenant's exclusion of the owner from the property.

We do not find in the dictionary we examined a definition of "holding over in possession" as a single term, but "holding over" and "possession" are defined separately. "Holding over" is "[a] tenant's action in continuing to occupy the leased premises after the lease term has expired." BLACK'S LAW DICTIONARY (10th ed. 2014). "Occupy" means "[t]o take up the extent, space, room, or time of," "[t]o hold possession of," or "[t]o live or stay in (a place)." *Id.* "Possession" is "[t]he fact of having or holding property in one's power; the exercise of dominion over property," and also, "[t]he right under which one may exercise control over something to the exclusion of all others; the continuing exercise of a claim to the exclusive use of a material object." *Id.* "Dominion" means "control" or "possession." *Id.*

The district court cited several Texas court opinions to support its construction of "holding over in possession." The plaintiffs embrace those authorities, contending that possession, *i.e.*, dominion, includes the power to use property. We will discuss many of the authorities on which the district court relied.

The district court stated the general principle that a tenant who occupies premises is holding over, citing *Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 908 (Tex. 2007). This definition closely aligns with the dictionary definition we already quoted. The parties in *Snider*, though, did not dispute that the tenant was holding over, so the court did not discuss the facts underlying why and how the tenant was occupying the premises.

No. 19-50361

It is also true that a tenant's interference with the landlord's use of the property is not required for holding over. *See Clark v. Whitehead*, 874 S.W.2d 282, 285 (Tex. App.—Houston [1st Dist.] 1994, writ denied). Continuous use of the land also is not required. *See id.* In *Clark*, some of the evidence of holdover included that the defendant company left piles of trash and equipment on the property, the defendant's trucks crossed the property to carry pipes to the other side, and a shed on the property had been freshly painted. *Id.* at 284–85. The jury found the defendant "occup[ied]" the land as a holdover tenant. *Id.* at 283. When viewing the evidence most favorably to the jury's finding, the court said the jury could "reasonably infer that the tenant occupied the property for a period of time." *Id.* at 285. Notably, the legal standard that court applied was occupation and not mere use, though use is evidence of occupation. *Id.*

In addition, retaining keys can be some evidence of possession and, therefore, evidence of holding over. *See Creative Cabinets, Inc. v. Jorrie*, 538 S.W.2d 207, 208–09 n.4 (Tex. Civ. App.—San Antonio 1976, writ ref'd n.r.e.). Yet, contrary to the plaintiffs' description of this case, retaining keys itself is not holding over or possession. In fact, in *Creative Cabinets*, not only did the defendant keep the keys, the tenant had not even surrendered the property during the holdover period, and the tenant had hired a contractor for some repairs on the property during the same period. *Id.* We also do not find particularly helpful another authority used by the district court, *Moskowitz v. Calloway*, 178 S.W.2d 878, 879 (Tex. Civ. App.—Texarkana 1944, writ ref'd w.o.m.). There, "[a]rticles belonging to the tenant were left in the premises for such period, and during that time the tenant retained possession of the keys to the building." *Id.* The court found this evidence supported "the trial court's conclusion that the tenant had retained possession." *Id. Moskowitz* did not say that keeping keys constitutes holding over but that it is some evidence of possession.

9

The district court also cited a case for the proposition that "to 'occupy' means 'to hold or keep for use.'" *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 467 (Tex. 1998).  That case involved whether a company "occupied" an easement for purposes of determining the extent of insurance coverage.  *Id.* at 464.  Significantly, the insurance policy's definition of "occupy" did not say "use" is the same as occupying; instead, *keeping* property for use is occupying.  *Id.* at 467.  Therefore, although the company was physically present on the land, it did not occupy the land.  *Id.*

Here, the district court found that the combination of (1) the retention of the keys to the gate, (2) the use of the gate as a shortcut, and (3) the use of the premises as a break area "constituted holding over."  We agree they are relevant evidence, but we do not agree that they are sufficient.  Continental did not occupy the premises of Buildings E and F, nor did Continental exercise dominion over the premises.  Continental surrendered the properties to the plaintiffs, though it retained a key to an outside gate.  We do not see support in the caselaw that a tenant occupies or controls property when something occurs as insignificant as when employees eat lunch at picnic tables on that property.

By the plain language of the contract, Continental did not breach Lease E/F by holding over in possession of the premises.

## II.    *Breach of Lease C: Air conditioning repair costs*

The district court also found Continental liable for the maintenance and repair costs under Leases B and C.  Section 16(a) of the lease required Continental to, "at its expense, . . . maintain and repair (and replace as necessary), and keep in as good a repair and operating condition as at the Commencement Date, . . . air conditioning or other equipment, . . . whether such repairs, maintenance, or replacements are . . . major or minor."

No. 19-50361

Continental does not dispute that the lease required that it maintain and repair the air conditioning.

The district court found as a matter of fact that "[w]hen the C lease began, the building's two air-conditioning units both worked." After the lease ended and the defendant vacated the building, the plaintiffs' president conducted a brief inspection and found no issue with the air-conditioning units. A month later, the plaintiffs contracted to sell the building to another buyer. Before closing, the buyer learned through its inspection that one of the air-conditioning units did not work. So, in September 2016, the plaintiffs agreed to reduce the building's sale price by $10,000. On April 26, 2017, the plaintiffs sent Continental a demand letter for $10,000 for the price reduction caused by the broken air-conditioning unit. The district court also found that, based on Continental's sales manager's trial testimony, the air-conditioning unit stopped working during Continental's tenancy. The plaintiffs' representative Tyrone Stoller testified that Continental's head of sales James Ball told Stoller that the "air conditioning was broken previously, that they had problems with it holding temperature with only the one air-conditioning unit in the summer."[1] Based on these facts, the district court concluded Continental violated Section 16(a) of Lease C.

Continental argues on appeal that the evidence was insufficient to support the district court's finding that the air-conditioning unit did not work when the premises were vacated and turned over to the plaintiffs. We uphold

---

[1] This testimony was admitted over the defendant's hearsay objections as an admission of a party opponent. FED. R. EVID. 801(d)(2). In its brief, Continental casually refers to the employee's comments as "hearsay," but Continental does not argue the district court erred in admitting the testimony as an opposing party statement.

this factual finding unless it is clearly erroneous.[2] *Dickerson*, 556 F.3d at 294. Overall, Continental argues that the principal evidence, which was Stoller's testimony that one of the air-conditioning units "was broken previously" during the company's tenancy, does not prove the air-conditioning unit was broken when Continental handed off the property upon Lease C's termination.

Continental also highlights three facts it believes weigh in its favor. First, Continental inspected the building before turning it over to the plaintiffs.  Second, immediately after the property was turned over, the plaintiffs inspected the air-conditioning units by turning them on and feeling the building become cooler.  Specifically, Stoller walked through the building to inspect it, and when he turned on both air-conditioning units to see if they worked, he thought the building became cooler.  Third, the plaintiffs did not report any problem with the air-conditioning unit until well after the lease ended, about eight months later.  Continental argues that whether the air-conditioning unit worked at the time the buyer inspected Building C (after August 8, 2016) is insufficient to prove the air-conditioning unit was broken when Building C was turned over on June 30, 2016.

The hurdle for this argument is that when a fact finder chooses between "two permissible views of the evidence," the choice "cannot be clearly erroneous."  *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).  We must also "give due regard to the trial court's opportunity to judge the witnesses' credibility."  FED. R. CIV. P. 52(a)(6).  Here, the evidence is not overwhelming for either party, but the district court was authorized to evaluate Stoller's credibility.  Findings about credibility, plus

---

[2] Continental asserts in a footnote that *de novo* review applies because it is challenging the district court's legal conclusion on liability, but we read the substance of Continental's argument as factual.

such evidence as was offered, support that "the air conditioner stopped working during Continental's tenancy," leading to the legal conclusion that Continental breached Lease C. The district court's finding was not clearly erroneous.

Next, Continental argues the evidence does not support an award of $10,000. The $10,000 award is based on a reduced sale price. Due to the necessary and unexpected repairs perceived by the buyer, the buyer asked for a $15,000 reduction in price. A contractor estimated it would cost between $7,000 and $11,000, plus tax, to fix the air-conditioning unit, but the contractor recommended not going with the lowest cost option. Ultimately, the buyer and the plaintiffs negotiated a $15,000 reduction in price: $5,000 for the repair of a lean-to shed on the property and $10,000 for the broken air-conditioning unit.

The $10,000 award is supported by the evidence.

### III.     *Breach of Lease B: Electrical wiring repair costs*

The district court found that Continental breached Lease B by causing damage to the electrical wiring when Continental vacated the premises and removed its equipment. Section 16 of the lease is again at issue. So is Section 19(a), which provides:

> Tenant shall deliver the Premises to Landlord . . . in as good order, repair and condition as on the Commencement Date . . . . Any damage caused by the installation or removal of furnishings, inventory, equipment, trade fixtures, or air conditioning and/or heating equipment owned by Tenant (but not damages caused by installation of equipment prior to the Commencement Date that Tenant purchased "in place" from Seller . . .) shall be repaired at Tenant's expense prior to the expiration of the Term of this Lease, and if Tenant fails to do so, and then fails to complete such work by the tenth (10th) day after the Landlord's written demand after expiration of the

> Term, then Landlord may do so and Tenant shall reimburse Landlord the cost thereof, plus an overhead charge to Landlord equal to ten percent (10%) of such costs, on demand.

The district court found that the electrical wiring was in order when Lease B began, but when the lease ended, Continental left exposed electrical wiring through the building "by haphazardly removing equipment installed during its tenancy."

Without informing Continental of the damage, the plaintiffs arranged for repairs for which the plaintiffs paid $2,800. The plaintiffs demanded that amount. The district court concluded that Section 19(a) applied but not its notice-and-cure requirement, and the court also applied Section 16's more general requirement to return the building in the same condition as the start of the lease, a provision not requiring notice. Thus, the court awarded $2,800 to the plaintiffs.

On appeal, Continental asserts that because the plaintiffs failed to give Continental notice of the damage and an opportunity to cure, Continental could not have breached the lease. Section 19(a) requires notice and an opportunity to cure only when the "damage [is] caused by the installation or removal of . . . equipment owned by" Continental. The plaintiffs argue that the removal of Continental's equipment at the end of the lease is factually not what caused the damage, but instead it was the "intentional cutting and stripping of the Facility's electrical conduit and wiring" as Continental prepared to remove the equipment. It is a fine point, that intentional damage to the wiring by its being carelessly disconnected from the tenant's equipment does not require notice and opportunity to repair, when such notice would be required if the damage resulted from the scraping or other ordinary effects of physically removing equipment.

The district court described causation this way: "Continental exposed electrical wiring throughout the building by haphazardly removing

equipment installed during its tenancy." The court's application of those facts to the lease language led it to conclude that the cutting of wires here — which is not the proper way to remove electrical equipment— was not damage caused by the removal of equipment:

> And although section 19 — the provision obligating Continental to turn over the building B electrical system in the same condition as at the start of the lease — does require notice and an opportunity to cure, the requirement extends only to one particular kind of damage: "damage caused by the installation or removal of . . . equipment owned by" Continental. The damage here — cutting and stripping electrical wiring owned by the corporations — is different.

We review *de novo* mixed questions of law and fact. The district court made a reasonable interpretation of what the lease meant when it made the phrase "notice and an opportunity to cure" applicable to what we describe – not the district court's words –as unintentional, accidental damage caused when equipment was being removed. We accept the district court's interpretation that the lessor's obligation to give notice and allow the tenant a chance to repair does not apply when the damage resulted from intentionally damaging the wiring during the equipment-removal process and not as a natural consequence of removing the equipment.

The district court did not err in awarding $2,800 for the electrical-wiring repair costs.

IV.    *Attorneys' fees*

The district court awarded the plaintiffs reasonable attorneys' fees, taxable costs of court, and non-taxable litigation expenses and pre-judgment interest on the awarded damages. The plaintiffs applied for attorneys' fees based on a provision in the lease agreements and based on Texas law. Texas law also provides for reasonable attorneys' fees to the prevailing party in a

contract case. TEX. CIV. PRAC. & REM. CODE § 38.001; *ExxonMobil Corp. v. Elec. Reliability Servs., Inc.*, 868 F.3d 408, 421 (5th Cir. 2017).

Continental predicates its claim of error relating to attorneys' fees on the first three issues in this case; if Continental wins this appeal on the merits, then the plaintiffs will not be the "prevailing party" in this case. Because the district court's order rested on the plaintiffs' success on several issues we reverse today, we vacate the order and remand to the district court for a reevaluation of reasonable attorneys' fees.

## V.     *Conditional cross-appeal*

When the district court ordered Continental to pay attorneys' fees, costs, and interest, the court did not grant the plaintiffs' request for contingent, prospective appellate attorneys' fees, finding the calculations too speculative. In a footnote, the district court observed that it could not accurately assess the reasonableness of the proposed contingent fees because it did not know how much the attorneys would work on an appeal, but the court did not explicitly deny appellate fees. This seems to us like a deferral or denial without prejudice of the motion insofar as it was for appellate fees.[3]

The plaintiffs cross-appealed the district court's order "out of an abundance of caution" to prevent waiver of the issue. The plaintiffs acknowledge in their cross-appeal "that the District Court's declining to award Plaintiffs [appellate] attorney's fees prospectively does not prejudice Plaintiffs' ability to request that the Court of Appeals and/or the Supreme

---

[3] In the district court, parties may move for attorneys' fees under Rule 54 of the Federal Rules of Civil Procedure. FED. R. CIV. P. 54(d). The commentary on the rule provides: "If an appeal on the merits of the case is taken, the court may rule on the claim for fees, may *defer* its ruling on the motion, or may deny the motion without prejudice, directing under subdivision (d)(2)(B) a new period for filing after the appeal has been resolved." FED. R. CIV. P. 54 advisory committee's note to the 1993 Amendment (emphasis added).

Court award such attorney's fees after they have been incurred." In the briefing, the plaintiffs ask us either to (1) grant their request for reasonable appellate attorneys' fees or (2) grant their request and remand to the district court for a determination of the amount of fees to be awarded. This reads like a motion, although the plaintiffs never reference the applicable local rule. *See* 5TH CIR. R. 47.8.

We accept preserving issues, but we conclude no cross-appeal was necessary. We lack appellate jurisdiction over such a cross-appeal because there was no final decision under 28 U.S.C. § 1291. The district court never ruled that the plaintiffs, if successful on appeal, would not be entitled to reasonable appellate attorneys' fees; the court merely said it would not order conditional fees for time not yet spent. The district court's refusal to grant conditional attorneys' fees does not meaningfully affect the plaintiffs' right to request appellate fees in that court, so any denial was without prejudice. *See Chevron USA Inc. v. Sch. Bd. Vermilion Par.*, 294 F.3d 716, 719–20 (5th Cir. 2002).

Nonetheless, parties may move or petition this court for appellate attorneys' fees under Fifth Circuit Local Rule 47.8. Parties can also move under Rule 54 of the Federal Rules of Civil Procedure in the district court. Here, although the plaintiffs purport to cross-appeal the district court's decision on appellate attorneys' fees, the plaintiffs brief a related but distinct issue: whether we should grant them appellate attorneys' fees. The plaintiffs are entitled to consideration of appellate attorneys' fees if they are the prevailing parties and successfully defend their judgment. TEX. CIV. PRAC. & REM. CODE § 38.001; *ExxonMobil Corp.*, 868 F.3d at 421.

Under Texas law, a prevailing plaintiff must receive a monetary or equitable award. *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 655 (Tex. 2009). Though *Intercontinental* did not decide when a defendant can be the prevailing party, *see WWW.URBAN.INC. v.*

*Drummond*, 508 S.W.3d 657, 666 (Tex. App.—Houston [1st Dist.] 2016, no pet.), Texas courts have said the prevailing party is the one who "prevails on the main issue in the litigation." *E.g.*, *SEECO, Inc. v. K.T. Rock, LLC*, 416 S.W.3d 664, 674 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). Applying Texas law to a claim for attorneys' fees on appeal, we explained that "a party entitled to recover attorneys' fees at trial is also entitled to recover them for successfully defending the case on appeal." *DP Sols., Inc. v. Rollins, Inc.*, 353 F.3d 421, 436 (5th Cir. 2003) (citing *Gunter v. Bailey*, 808 S.W.2d 163, 165–66 (Tex. App.—El Paso 1991, no writ)).

Today we reverse more of the appealed award than we affirm, though. Continental has prevailed on the main issue on appeal as we view the mix, which is that it was not a holdover tenant. As a result, even if the plaintiffs are the prevailing parties below, they likely have not prevailed in this court.

\* \* \*

We AFFIRM the district court's judgment as to the breaches of Lease B and Lease C and damages; we REVERSE as to the breach of Lease E/F and RENDER partial judgment to Continental on that issue; and we VACATE the attorneys' fees order and REMAND for a determination of trial-level reasonable attorneys' fees. We DISMISS the cross-appeal and DENY the plaintiffs' request for appellate attorneys' fees.